## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-21537-CIV-LENARD/LOUIS

**ROY S. SHIVER, JR.,**

      Plaintiff,

**v.**

**CITY OF HOMESTEAD, FLORIDA,**
**GEORGE GRETSAS,**
**TOM MEAD, and**
**RICKY RIVERA,**

      Defendants.

_____/

## ORDER GRANTING DEFENDANT GEORGE GRETSAS'S MOTION TO DISMISS SECOND AMENDED COMPLAINT (D.E. 35) AND GRANTING HOMESTEAD DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT WITH PREJUDICE (D.E. 36)

**THIS CAUSE** is before the Court on Defendant George Gretsas's Motion to Dismiss Second Amended Complaint, (D.E. 35), filed August 23, 2021. Plaintiff Roy S. Shiver, Jr. filed a Response on September 7, 2021, (D.E. 41), to which Gretsas filed a Reply on September 14, 2021, (D.E. 42).

Also before the Court is Defendants the City of Homestead Florida, Tom Mead, and Ricky Rivera's (the "Homestead Defendants") Motion to Dismiss Second Amended Complaint with Prejudice, (D.E. 36), filed August 23, 2021. Plaintiff filed a Response on September 7, 2021, (D.E. 40), to which the Homestead Defendants filed a Reply on September 14, 2021, (D.E. 43).

Upon review of the Motions, Responses, Replies, and the record, the Court finds as follows.

## I.    Background

### a.    Factual allegations[1]

At all material times, Defendant Gretsas was the City Manager for the City of Homestead, Florida, with ultimate and final policy-making authority and power over all personnel decisions, public records policy, and policing policy.  (Second Am. Compl. ¶ 22.)  At all material times, Defendants Mead and Rivera were police detectives for the City of Homestead.  (Id. ¶ 24.)

Plaintiff is a life-long resident of the City of Homestead.  (Id. ¶ 18.)  He served three terms on the Homestead municipal council, including two terms as mayor.  (Id.)  He was later appointed County Manager for Miami-Dade County, Florida.  (Id.)  He subsequently joined the private sector, eventually becoming the Executive Director of the South Florida Police Benevolent Association ("SFPBA").  (Id.)

Throughout his career, Plaintiff remained outspoken about politics and civic causes in Homestead, which made him a "target."  (Id. ¶ 19.)  "Upon information and belief, Defendant Gretsas began assembling a Dossier against Plaintiff as soon as Plaintiff began to speak against Gretsas publicly and online and continued at least through 2019."  (Id. ¶ 20.)  "Plaintiff, unbeknownst to him, was also included in another Dossier prepared against a different perceived adversary of Gretsas, HPD Captain William Rea."  (Id.)  "Throughout

---

[1]    The following facts are gleaned from Plaintiff's Second Amended Complaint, (D.E. 32), and are deemed to be true for purposes of ruling on the Motions to Dismiss.

this time, Defendant Gretsas, released false and misleading information he had gathered and created against Plaintiff within the scope of his employment with the City, causing Plaintiff to ultimately be terminated from his job with an unrelated employer, publicly humiliated and ultimately losing his race for mayor." (Id. ¶ 21.)

The Second Amended Complaint alleges that Plaintiff engaged in three separate "protected activities" for purposes of his claims of retaliation:

- **Protected Activity I – Plaintiff published online and publicly about waste, fraud, and abuse within the City's government, including about Defendant Gretsas:**

    26.  On May 20, twice on May 24, June 24, and July 5, 2017, Plaintiff in Facebook posts criticized and raised questions about significant construction projects proposed or supported by Gretsas and other government abuse in Homestead. Also in 2017, Plaintiff publicly spoke to various persons about the same issues.

- **Protected Activity II – Confronting members of the HPD about improper policing of Plaintiff in Homestead:**

    27.  On May 20th, 2019, Plaintiff wrote on Facebook about the defamation and police harassment of himself and family and complained to HPD Captain Scott Kennedy that he was tired of getting maligned and defamed by Defendant Gretsas. Thereafter, Plaintiff spoke again to Captain Scott Kennedy at Plaintiff's place of business and similarly expressed his frustrations. Likewise, beginning on July 1, 2019, Plaintiff communicated with Defendant Mead via text messages and on the telephone, requesting that the HPD should leave him alone.

- **Protected Activity III – Plaintiff Running for City Mayor:**

    28.  On July 1, 2019, Plaintiff announced a run for mayor of Homestead, and spoke out freely about his position on political and civic issues, criticizing Homestead's government and management at the time. Plaintiff communicated his criticisms via Facebook, in public speeches, campaign events, and personal conversations.

(Id. ¶¶ 26-28.)

The Second Amended Complaint alleges that Defendants took four adverse actions against Plaintiff in response to his protected activities:

- **Adverse Action I – Improperly gathering information about Plaintiff:**

29. On May 22, 2017, two days after Plaintiff began to speak out (see ¶26, supra), Homestead citizen Pat Pascuzzo wrote an email to Miami Herald Reporter Monique O. Madan, with the subject "More Info Shiver Stuff:" In the email, Mr. Pascuzzo wrote: "The City of Homestead has a detective that serves as the FBI liaison, his name is Tom Mead. Tom Mead is in charge of the Shiver/Homestead investigation. He has brought the FBI up to date because they needed subpoenas for financials."

30. On the flash drives left behind by Defendant Gretsas after his firing from the City of Delray Beach in 2020, and from targeted public records request thereafter, Plaintiff found evidence of the following instances of improper information gathering by HPD officers at the direction of or with the knowledge of Defendant Gretsas:

31. June 4, 2018, Defendant Gretsas prepared a memorandum seeking an "inventory of every failure [Plaintiff] has had." In the memorandum, City manager Gretsas ordered Defendants Mead and Rivera to investigate numerous legal cases in Tennessee and North Carolina, and to access all negative information they could find on Plaintiff. The memorandum also asked for negative information on Plaintiff's father, Roy S. Shiver, councilman in neighboring Florida City. This memorandum was a blueprint for the retaliatory investigation to be undertaken against Plaintiff.

32. Defendants Rivera and Mead complied with Defendant Gretsas' instructions and searched for and seized information concerning Defendant Shiver. They, and possibly other members of the HPD, used municipal resources to follow and investigate Plaintiff, his wife, his father, and his associates and friends without probable cause or reasonable suspicion of illegal activities, solely for the purpose of developing damaging information about Plaintiff.

33. HPD officers took secret photographs, entirely outside of an official investigation into any wrongdoing, far outside City limits, of Plaintiff's associates placing election signs throughout Miami-Dade County. Employees of the HPD thus acted as a rogue unit controlled by Defendant Gretsas, with his explicit knowledge and/or approval, for purposes not related to the legitimate exercise of police power.

34. Detective Rivera illegally accessed Plaintiff's Drivers Information seeking adverse information concerning Plaintiff. Defendant Rivera knowingly obtained, disclosed or used the personal information of Plaintiff from the DAVID/NCIC/FCIC motor vehicle records for a use not permitted and by making a false representation to obtain information negative concerning Plaintiff. Doing so, he violated 18 U.S.C. §2722 (Prohibition on release and use of certain personal information from state motor vehicle records related to illegal searches of restricted government databases).

35. Further, Defendant Mead, who was the HPD's FBI Liaison, actually obtained from federal resources two Banking Suspicious Activity Reports ("SARs") regarding Plaintiff, and then sent these confidential reports to City officials and to Defendant Gretsas via Gretsas' personal Gmail account.

36. Perhaps the most depraved discovery found in the flash drives and emails retrieved in public information requests was a scheme spear-headed by Defendant Gretsas to collect physical "evidence" from the garbage of Plaintiff. Email chains obtained in public records requests clearly show that Plaintiff's garbage was "collected" by a private individual outside of the City boundaries, and then transported to a location inside the City limits and placed in the back of a pick-up truck, to be collected there by HPD. The garbage bag allegedly contained straws with residue of cocaine and other incriminating items. Gretsas willingly accepted the garbage from the private individual who claimed to have collected it from Plaintiff's house, and integrated some information gleaned from Plaintiff's alleged trash into his PowerPoint presentations and lengthy memorandum, all in an effort to harm Plaintiff.

37. Defendant Gretsas also requested, and Homestead City attorneys Weiss Serota Helfman obtained and provided to Gretsas, transcripts of a deposition given by Plaintiff in a personal bankruptcy case.

- **Adverse Action II – Creating public records with false or misleading information concerning Plaintiff:**

38. On or about May 15, 2019, Defendant Gretsas created a 228-page PowerPoint presentation, entitled "Miami Herald-Shiver Draft," with negative information about Plaintiff, spanning 20 years of Plaintiff's public service career. Much of the information was taken out of context and was false and/or misleading. The presentation also contained false information against former HPD Captain William Rae.

39. The 228-page PowerPoint presentation also contained false information concerning Plaintiff's father and business associates, and other false or misleading information. For example, the presentation contained a section called "Felon Sign Brigade" with photographs taken by HPD officers of election signs being legally set up by Plaintiff's associates in Miami-Dade County.

40. Defendant Gretsas also created a 30-page PowerPoint presentation for Reporter Michael Putney, containing more misrepresentations concerning Defendant Gretsas.

41. Also on the flash drives was a crime-syndicate chart showing an entirely fake money laundering investigation against former Homestead Police Captain William Rea, in 2013, where Plaintiff Shiver was shown as a co-conspirator in the non-existing money laundering scheme. In reality, there never was such an investigation, and there definitely never was any money laundering activity on the part of Plaintiff. The fake money-laundering flow-chart also included Plaintiff's father Roy S. Shiver and photos of business in neighboring Florida City, all without any connection to illegal activity whatsoever. The chart bears the misleading and libelous legend "at this time no subpoenas obtained or served."

42. One of the more shocking discoveries on Gretsas' flash drives was a four-page fact sheet on Plaintiff, containing numerous pieces of personal information, such as complete credit card numbers and passwords, complete bank account numbers, Plaintiff's children's health insurance information, social security numbers, prescriptions and medications of his entire family, and the false allegation that cocaine was found in Plaintiff's possession.

43. On June 15, 2018, Defendant Mead sent an email entitled "interesting reading" to Defendant Gretsas' private email address, bearing Detective Mead's FBI signature block, attaching the illegally gathered SARs concerning Plaintiff. The email with the attached SARs was also located on Defendant Gretsas' City flash drives. While Plaintiff's activity reported in the SARs was not improper, the mere possession by and sharing of SARs by Defendant Mead with Manager Gretsas and the City is likely illegal/felonious. Using private emails to circumvent public records law also violated Florida law but did not prevent the information from becoming a public record, as these records and communications became part of the official business of City and were meant to communicate, perpetuate, or formalize knowledge.

44. Defendant Gretsas further prepared a 109-page memorandum concerning Plaintiff, alleging that the HPD was conducting three separate criminal investigations against Plaintiff. The memorandum contained false allegations of drug use by Plaintiff.

45. Also placed in the Homestead public records was a copy of the deposition given by Plaintiff in a personal bankruptcy proceeding.

- **Adverse Action III – Targeted disclosure of illegally gathered information concerning Plaintiff to the press and the public.**

46. Defendant Gretsas repeatedly communicated false and misleading information about Plaintiff he had gathered with City resources to third parties, including without limitation Homestead's mayor and council, civic leaders, local residents, and at least twice to the Miami Herald.

47. Upon information and belief, the 228-page PowerPoint presentation entitled "Miami Herald-Shiver Draft" was sent by Gretsas to the Miami Herald. In turn, the Miami Herald published highly negative articles on May 22, 2018, and on May 26, 2018, which included information and photographs from the 228-page PowerPoint presentation.

48. A portion of the 109-page memorandum described above in paragraph 44, was sent by Gretsas' assistant, Jason King, to Monique O. Madan on or about June 13, 2019. The email from Jason King to Monique O. Madan contained the following statement, along with excerpts of the 109-page memorandum:

> This report has been written in response to false allegations made by Steve Shiver (a.k.a Roy Stephen Shiver, Jr., a/k/a Roy S. Shiver, a.k.a. Roy S. Shiver, Jr., a.k.a. Stephen Shiver, a.k.a. Roy Stephen Shiver, a.k.a. Shiver Roy S, Jr.) that he has been the target of improper policing by the Homestead Police Department (HPD). His claims are without merit. Mr. Shiver has been the subject of three separate, unrelated and properly conducted criminal investigations by the Homestead Police Department over the past two and a half years. Two of the unrelated cases are still open and one has been closed. The first report will only address the closed case, in which Mr. Shiver was the subject of a narcotics investigation. The two other cases are still active.

49. On July 1 and July 3, 2019, just after Plaintiff Shiver had announced his run for Homestead Mayor, Defendant Gretsas sent the 109-page

memorandum to the Mayor and City Council of Homestead via the Homestead email system.

50. On July 3, 2019, Gretsas' assistant Jason King sent the final version of the 109-page memorandum to the Miami Herald's Monique O. Madan, copying Defendant Gretsas with the subject "as per your request."

51. Also on July 3, 2019, at 8.57 am, Homestead Citizen Pat Pascuzzo emailed the Miami Herald's Monique O. Madan asking whether she had received a copy of the Shiver City of Homestead Police Investigation. Monique O. Madan replied back at 8:58 am: "you're late."

52. On the very same day, July 3, 2019, the Miami Herald published another negative article based upon the false and/or misleading information in Defendant Gretsas' 109-page memorandum.

53. Defendant Gretsas also presented the information he and officers of the HPD had gathered to civic leaders in Homestead. Some of the presentations by Gretsas took place in City offices, where Defendant Gretsas disclosed selected materials from Plaintiff's Dossier to police chief Alexander Rolle, then-mayor Jeffrey Porter, City Council members Judy Waldman, Jimmie Williams, Jon Burgess and Elvis Maldonado, as on information and belief also to other private persons.

- **Adverse Action IV – Contacting Plaintiff's Employer with negative information:**

  54. In the June 4, 2018, memorandum by Defendant Gretsas (see ¶31, above), Defendant Gretsas articulated 18 specific derogatory points he wanted made by to Plaintiff's employer. After the June 4, 2018, memorandum was prepared, Homestead Police Captain Scott Kennedy, under order and/or direction of Defendant Gretsas, contacted Steadman Stahl, President Case 1:21-cv-21537-JAL Document 32 Entered on FLSD Docket 08/09/2021 Page 12 of 22 of the SFPBA, where Plaintiff was employed at the time. Upon information and belief, Captain Scott Kennedy or other HPD officers gave derogatory information concerning Plaintiff to Plaintiff's employer.

(Id. ¶¶ 29-54.)

### b.    Procedural background

On February 4, 2021, five plaintiffs—including Plaintiff, William Rea, Ednamarie Hernandez, James E. McDonough, and Vanessa Lynn McDonough—filed a Complaint against Defendants (and City of Homestead Police Chief Alexander Rolle) in the United States District Court for the Southern District of Florida.  Rea, et al. v. City of Homestead, et al., Case No. 21-20488-Civ-Moore (the "Original Action"), D.E. 1 (S.D. Fla. Feb. 4, 2021).  On March 31, 2021, Defendants filed Motions to Dismiss and to Sever, arguing that the Complaint (1) was a "shotgun pleading," (2) failed to state a claim upon which relief can be granted, and (3) failed to meet the requirements of permissive joinder and, as such, the Court should sever Plaintiffs' claims.  Id., D.E. 15, 16.  On April 6, 2021, before Plaintiffs filed a response to the Motions to Dismiss and Sever, Judge Moore issued a Paperless Order providing Plaintiffs an opportunity to cure the purported pleading defects and file an amended complaint pursuant to Federal Rule of Civil Procedure 15(a)(1)(B); otherwise, they could respond to the Motions to Dismiss and Sever.  Id., D.E. 17.  The same day, Plaintiffs filed a Notice of Intent to Amend Pleadings.  Id., D.E. 18.

On April 21, 2021, Plaintiff Shiver voluntarily severed his claims from those of the other Plaintiffs and filed an Amended Complaint against Defendants herein (and Chief Rolle) which was opened as the instant action.  ("First Amended Complaint," D.E. 1.)

On June 21, 2021, Defendants filed Motions to Dismiss the First Amended Complaint, arguing that the First Amended Complaint was a "shotgun pleading," (D.E. 21 at 3-7; D.E. 22 at 3-6), and failed to state claims upon which relief can be granted, (D.E. 21 at 7-21; D.E. 22 at 7-17);  the City additionally argued that Counts V, VI, and VII of

the First Amended Complaint should be dismissed because Plaintiff failed to comply with the pre-suit notice requirements of Section 768.28(6), Florida Statutes, (D.E. 21 at 17-18). On July 26, 2021, the Court issued an Order granting in part both Motions to Dismiss, finding that the First Amended Complaint must be dismissed as an improper shotgun pleading.  (D.E. at 16-17.)  The Court stated that it would "provide Plaintiff leave to make a <u>final</u> amendment to cure all deficiencies, if they are able to so."  (<u>Id.</u> at 16 (citing <u>Smith v. Psychiatric Sols., Inc.</u>, 750 F.3d 1253, 1262 (11th Cir. 2014)).)  The Court further stated that although it was taking "no position on the merits of Defendants' arguments that the Amended Complaint fails to state a claim upon which relief can be granted, to the extent that those arguments have merit Plaintiff should endeavor to cure the deficiencies identified by Defendants' Motions (and any other deficiencies)."  (<u>Id.</u> at 16-17.)

On August 9, 2021, Plaintiff filed the Second Amended Complaint which contains the following causes of action:

- <u>Count I</u>: civil rights violation under 42 U.S.C. § 1983 against Defendant Ricky Rivera based upon an improper investigation of Plaintiff in retaliation for Plaintiff's Protected Activities I and II, (D.E. 32 ¶¶ 55-64);

- <u>Count II</u>: civil rights violation under 42 U.S.C. § 1983 against Defendant Tom Mead based upon an improper investigation of Plaintiff in retaliation for Plaintiff's Protected Activities I and II, (<u>id.</u> ¶¶ 65-74);

- <u>Count III</u>: civil rights violation under 42 U.S.C. § 1983 against Defendant George Gretsas for illegally gathering information on Plaintiff in retaliation for Plaintiff's Protected Activities I, II, and III, (<u>id.</u> ¶¶ 75-84);

- <u>Count IV</u>: civil rights violation under 42 U.S.C. § 1983 against Defendant George Gretsas for creating and publishing false or misleading information concerning Plaintiff in retaliation for Plaintiff's Protected Activities I, II, and III, (<u>id.</u> ¶¶ 85-94); and

- <u>Count V</u>: civil rights violation under 42 U.S.C. § 1983 against the City of Homestead, (<u>id.</u> ¶¶ 95-111).

On August 23, 2021, Defendants filed their Motions to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  (D.E. 35, 36.)  Defendant Gretsas argues that Counts III and IV fail to state claims upon which relief can be granted, and in any event, he is entitled to qualified immunity.  (D.E. 35 at 3-20.)  Defendants Rivera and Mead argue that Counts I and II, respectively, fail to state claims upon which relief can be granted, and in any event, they are entitled to qualified immunity.  (D.E. 36 at 2-10.)  The City argues that Count V fails to state a claim under Section 1983 and <u>Monell v. Department of Social Services of City of New York</u>, 436 U.S. 658, 691 (1978).  (<u>Id.</u> at 10-17.)

## II.   Legal Standards

### a.   Failure to state a claim

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a claim for "failure to state a claim upon which relief can be granted."  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  Conclusory statements, assertions or labels will not survive a 12(b)(6) motion to dismiss.  <u>Id.</u>  "A claim has facial

11

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.; see also Edwards v. Prime, Inc., 602 F.3d 1276, 1291 (11th Cir. 2010) (setting forth the plausibility standard). "Factual allegations must be enough to raise a right to relief above the speculative level[.]" Twombly, 550 U.S. at 555 (citation omitted). Additionally:

> Although it must accept well-pled facts as true, the court is not required to accept a plaintiff's legal conclusions. Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (noting "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"). In evaluating the sufficiency of a plaintiff's pleadings, we make reasonable inferences in Plaintiff's favor, "but we are not required to draw plaintiff's inference." Aldana v. Del Monte Fresh Produce, N.A., Inc., 416 F.3d 1242, 1248 (11th Cir. 2005). Similarly, "unwarranted deductions of fact" in a complaint are not admitted as true for the purpose of testing the sufficiency of plaintiff's allegations. Id.; see also Iqbal, 129 S. Ct. at 1951 (stating conclusory allegations are "not entitled to be assumed true").

Sinaltrainal v. Coca-Cola, 578 F.3d 1252, 1260 (11th Cir. 2009), abrogated on other grounds by Mohamad v. Palestinian Auth., 566 U.S. 449, 132 S. Ct. 1702, 1706 n.2 (2012). The Eleventh Circuit has endorsed "a 'two-pronged approach' in applying these principles: 1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting Iqbal, 556 U.S. at 679).

### b.    Qualified immunity

"Qualified immunity shelters government officials performing discretionary functions from 'liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known.'" Corey Airport Servs., Inc. v. Decosta, 587 F.3d 1280, 1284-85 (11th Cir. 2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "While the defense of qualified immunity is typically addressed at the summary judgment stage of a case, it may be . . . raised and considered on a motion to dismiss." St. George v. Pinellas Cnty, 285 F.3d 1334, 1337 (11th Cir. 2002).  Indeed, the Eleventh Circuit has stated that "[b]ecause qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation,' Mitchell [v. Forsyth, 472 U.S. 511, 525 (1985)], questions of qualified immunity must be resolved 'at the earliest possible stage in litigation.'" Gonzalez v. Reno, 325 F.3d 1228, 1233 (11th Cir. 2003) (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)).  "While there may be a dispute as to whether the alleged facts are the actual facts, in reviewing the grant of a motion to dismiss, [the Court is] required to accept the allegations in the complaint as true." Id.

To receive qualified immunity, the government official must first prove that he was acting within his discretionary authority.  Gonzalez, 325 F.3d at 1234 (citing Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002)).  "A government official acts within his or her discretionary authority if objective circumstances compel the conclusion that challenged actions occurred in the performance of the official's duties and within the scope of this authority." Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1185 n.17 (11th Cir. 1994).

"Once the defendants have established that they were acting within their discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is

not appropriate." Gonzalez, 325 F.3d at 1234 (citing Vinyard, 311 F.3d at 1346). On a motion to dismiss, "[t]o evaluate claims of qualified immunity, the Court considers whether (1) the plaintiff has alleged a violation of a constitutional right; and (2) whether the right was 'clearly established' at the time of the defendant's misconduct." Rehberg v. Paulk, 611 F.3d 828, 838-39 (11th Cir. 2010). A Plaintiff can demonstrate the right was clearly established in three ways:

> First, the plaintiffs may show that "a materially similar case has already been decided." Mercado v. City of Orlando, 407 F.3d 1152, 1159 (11th Cir. 2005) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). Second, the plaintiffs can point to a "broader, clearly established principle [that] should control the novel facts [of the] situation." Id. (citing Hope, 536 U.S. at 741, 122 S. Ct. 2508). Finally, the conduct involved in the case may "so obviously violate[ ] th[e] constitution that prior case law is unnecessary." Id. (citing Lee, 284 F.3d at 1199). Under controlling law, the plaintiffs must carry their burden by looking to the law as interpreted at the time by the United States Supreme Court, the Eleventh Circuit, or the Florida Supreme Court.

Terrell v. Smith, 668 F.3d 1244, 1255 (11th Cir. 2012). "These two steps do not have to be analyzed sequentially; if the law was not clearly established, [the Court] need not decide if the Defendants actually violated the Plaintiff's rights." Fils v. City of Aventura, 647 F.3d 1272, 1287 (11th Cir. 2011) (citing Oliver v. Fiorino, 586 F.3d 898, 905 (11th Cir. 2009)).

## III.   Discussion

The Court will address each Count of the Second Amended Complaint in sequence. Because Defendants Rivera and Mead assert the same arguments, the Court will address Counts I and II together.

### a. Counts I and II

In Counts I and II, Plaintiff alleges that Defendants Rivera and Mead, respectively, violated his civil rights by conducting a retaliatory investigation without a legitimate law enforcement purpose in response to Plaintiff's exercise of his First Amendment rights, in violation of 42 U.S.C. § 1983.  (D.E. 32 ¶¶ 55-74.)

Defendants Rivera and Mead argue that Counts I and II fail to plausibly allege facts establishing the elements of a First Amendment retaliation claim, (D.E. 36 at 2-6), and in any event, they are entitled to qualified immunity, (id. at 6-10).  Because the Court finds that Defendants Rivera and Mead are entitled to qualified immunity, the Court will confine its analysis to that issue.

Defendants Rivera and Mead argue that they are entitled to qualified immunity because (1) they acted in the course and scope of their discretionary authority at all times alleged in the Second Amended Complaint and (2) Plaintiff has not alleged a violation of a clearly established Constitutional right.  (Id. at 6-10.)  They argue that Plaintiff's claims against them are explicitly based upon a purported retaliatory investigation, and the Eleventh Circuit "has explicitly held that the 'right to be free from a retaliatory investigation is not clearly established.'"  (Id. at 8 (quoting Rehberg v. Paulk, 611 F.3d 828, 850-51 (11th Cir. 2010), aff'd, 566 U.S. 356 (2012)).)

Plaintiff concedes that the Second Amended Complaint alleges that Defendants Rivera and Mead acted within their discretionary authority, but argues that they are not entitled to qualified immunity because their conduct violated clearly established law of which a reasonable person would have known.  (D.E. 40 at 10.)  Specifically, he argues

that he has adequately alleged a violation of his First Amendment rights against retaliation, and in the Eleventh Circuit "it is 'settled law' 'since at least 1988' that the government may not retaliate against citizens for the exercise of First Amendment rights."  (Id. (quoting Bennett v. Hendrix, 423 F.3d 1247, 1256 (11th Cir. 2005), and relying on Bailey v. Wheeler, 843 F.3d 473, 486 (11th Cir. 2016)).)

In Reply, Defendants Rivera and Mead maintain that they are entitled to qualified immunity because binding precedent holds that retaliatory investigation is not a recognized constitutional tort.  (D.E. 43 at 6-7 (citing Rehberg, 611 F.3d at 850-51).)

In a sense, both Parties are correct.  In Bennett, the Eleventh Circuit recognized a broad, clearly established principle that "the government may not retaliate against citizens for the exercise of First Amendment rights[.]"  423 F.3d at 1256.  See also Bailey, 843 F.3d at 484-85.  On the other hand, in Rehberg, the Eleventh Circuit held that the specific "right to be free from a retaliatory investigation is not clearly established."  611 F.3d at 851.

The Court finds that the more specific holding from Rehberg controls here because Counts I and II of the Second Amended Complaint explicitly allege claims for retaliatory investigation.  (D.E. 32 ¶¶ 55-74.)  Both Bennett and Bailey are distinguishable on the facts because they involved retaliatory harassment and intimidation but not a retaliatory investigation.  See Thompson v. Hall, 426 F. App'x 855, 859-60 (11th Cir. 2011) (observing that Rehberg involved a retaliatory investigation while Bennett involved retaliatory harassment and intimidation, and finding that the plaintiffs' claim for retaliatory investigation failed in light of Rehberg).

In <u>Bennett</u>, the plaintiffs supported a referendum to transfer power from the Forsyth County Sheriff's Department to a county-wide police force.   423 F.3d at 1249.   The referendum failed, but the Sheriff's office thereafter allegedly "engaged in a campaign of retaliation and intimidation against the plaintiffs because of their support of the referendum."  <u>Id.</u>

> Among many other acts of intimidation, they allege the defendants took down license tag numbers of cars at a forum in support of the referendum, surveilled the plaintiffs' homes and businesses, set up roadblocks near their homes, stopped their cars without reason and issued false traffic citations, accessed government databases to obtain confidential information on the plaintiffs, attempted to obtain a warrant for their arrest on trumped-up environmental charges, and mailed flyers to 35,000 homes in Forsyth County calling the plaintiffs the "real criminals," members of a "chain gang," and "the same type of criminals that terrorize Forsyth County."

<u>Id.</u>  The plaintiffs sued under Section 1983 alleging, inter alia, First Amendment retaliation. <u>Id.</u>  At the summary judgment stage, the district court found that the defendants were not entitled to qualified immunity because "they had violated the plaintiffs' constitutional rights, and those rights were clearly established at the time." <u>Id.</u>  The defendants prosecuted an interlocutory appeal, and the Eleventh Circuit affirmed.  <u>Id.</u> at 1256.  Initially, the court found that the plaintiffs had adequately pled a claim for First Amendment retaliation because the defendants' alleged retaliatory acts—which the Eleventh Circuit typified as "harassment"—"would likely deter a person of ordinary firmness from the exercise of First Amendment rights."  <u>Id.</u> at 1254-55.  It then found that that "the law was clearly established at the time of the defendants' alleged actions that retaliation against private citizens for exercising their First Amendment rights was actionable."  <u>Id.</u> at 1255.

In <u>Bailey</u>, the plaintiff, a former City of Douglasville police officer, filed written complaints with his Chief alleging that other officers of the Douglasville Police Department and Douglas County Sheriff's Office were racially profiling minority citizens and committing other constitutional violations.  843 F.3d at 478.  Later, the plaintiff's supervisors ordered him to rewrite incident reports he had previously filed.  <u>Id.</u> at 478-79.  When he told his supervisors that rewriting incident reports violated Police Department policy he was reprimanded and ultimately terminated from his position.  <u>Id.</u>  The plaintiff appealed his termination to the City.  <u>Id.</u>  On the night the City held a hearing on the appeal, "two deputies in a Sheriff's Office vehicle followed Bailey as he drove his personal car from Douglasville into the City of Atlanta.  When Bailey entered his intended destination, the two deputies followed him in and stared him down."  <u>Id.</u>  The next day, an officer from the Sheriff's Office, Wheeler, issued a BOLO (Be on the Lookout bulletin) on the plaintiff, displaying the plaintiff's photograph, calling him a "loose cannon," and warning law-enforcement officers to "[c]onsider this man a danger to any [law-enforcement officer] in Douglas County and act accordingly."  <u>Id.</u>  "And for the second day in a row, law enforcement—this time vehicles from both the Sheriff's Office and the Police Department—followed Bailey as he drove his personal car."  <u>Id.</u>  The plaintiff later sued Wheeler (among others) alleging a First Amendment retaliation claim under Section 1983.  <u>Id.</u>  Wheeler moved to dismiss on qualified immunity grounds, but the district court denied the motion.  <u>Id.</u>  Wheeler prosecuted an interlocutory appeal and the Eleventh Circuit affirmed.  <u>Id.</u> at 486.  Relevant here, the Eleventh found that "Wheeler's BOLO 'would likely deter a person of ordinary firmness from the exercise of First Amendment rights.'"

Id. at 481.  It noted, for example, that the BOLO described the plaintiff "as a 'loose cannon'
who was a 'danger to any [law-enforcement officer] in Douglas County'" and "empowered
these now-anxious officers to 'act accordingly' upon coming into contact with [the
plaintiff]." Id. at 481-82.  The Eleventh Circuit found that "this situation, which potentially
seriously endangered [the plaintiff's] life, easily would deter a person of ordinary firmness
from exercising his First Amendment rights." Id. at 482.  The Eleventh Circuit then found
that, pursuant to Bennett, the law was clearly established that "a law-enforcement officer
certainly may not use his position to potentially seriously endanger a person's life in
retaliation for exercising First Amendment rights." Id. at 485.  The Eleventh Circuit further
stated that

> even if it were not, it is certainly obvious, as a general proposition and
> without reference to case law, that issuing the BOLO Wheeler issued in this
> case, under the circumstances that existed at the time, allegedly in retaliation
> for Bailey's speaking up about alleged civil-rights abuses, clearly violated
> Bailey's First Amendment rights. Law-enforcement officers are sworn to
> protect and defend the lives of others. It is completely antithetical to those
> sworn duties for a law-enforcement officer to use his position to harness the
> power of an entire county's law-enforcement force to teach a lesson to—and
> potentially very seriously endanger—someone who had the temerity to speak
> up about alleged abuses.

Id.

Here, the Second Amended Complaint does not allege that Defendants Rivera and
Mead conducted "a campaign of retaliation and intimidation" against Plaintiff, Bennett,
423 F.3d at 1249, or retaliation that potentially seriously endangered Plaintiff's life, Bailey,
843 F.3d at 485.  Indeed, the Second Amended Complaint does not allege that Plaintiff
even knew about the investigation while it was allegedly happening.  (See Second Am.

Compl. ¶ 30 (alleging that Plaintiff "found evidence" of the investigation in 2020); <u>see also</u> <u>generally</u> <u>id.</u> ¶¶ 29-54).)   To the contrary, the Second Amended Complaint alleges that Defendants Rivera and Mead conducted a "<u>clandestine</u> investigation without a legitimate law enforcement purpose, keeping it off the books, but providing the results of this investigation which included false and/or misleading statements and/or arrangements of documents to [their] supervisor Gretsas." (D.E. 32 ¶¶ 60, 70 (emphasis added).)   However, this is the type of conduct that the Eleventh Circuit held in <u>Rehberg</u> was <u>not</u> a violation of <u>clearly established</u> law.   611 F.3d at 850-51.

In <u>Rehberg</u>, the plaintiff allegedly sent anonymous faxes to the management of a hospital which criticized the management and activities of the hospital.   <u>Id.</u> at 835.   As a "favor" to the hospital, the District Attorney of Dougherty County, Georgia and the Chief Investigator in the District Attorney's Office initiated a criminal investigation of the plaintiff without probable cause to do so.   <u>Id.</u>   The defendants subpoenaed the plaintiff's telephone service provider and obtained his telephone records, and subpoenaed his internet service provider and obtained his personal emails.   <u>Id.</u>   The defendants ultimately secured three indictments against the plaintiff.   <u>Id.</u> at 835-36.   The plaintiff sued the District Attorney and the Investigator (among others) under Section 1983 for, inter alia, retaliatory investigation "for their alleged retaliation against [the plaintiff] because he exercised First Amendment free speech rights[.]"   <u>Id.</u> at 837.   The complaint alleged that the defendants engaged in retaliatory investigation in order to chill the plaintiff's political speech.   <u>Id.</u> at 850.   The district court denied the defendants' motion to dismiss on qualified immunity grounds, and the defendants appealed.   <u>Id.</u>   The Eleventh Circuit held that even assuming

the plaintiff had "stated a constitutional violation by alleging that [the defendants] initiated an investigation and issued subpoenas in retaliation for Rehberg's exercise of First Amendment rights, [the defendants] still receive qualified immunity because [the plaintiff's] right to be free from a retaliatory investigation is not clearly established." Id. at 850-51.  The Eleventh Circuit observed that "[t]he Supreme Court has never defined retaliatory investigation, standing alone, as a constitutional tort, and neither has this Court. Without this sort of precedent, [a plaintiff] cannot show that the retaliatory investigation alleged here violated his First Amendment rights."  Id. (internal citation omitted). Furthermore, "retaliatory animus does not create a distinct constitutional tort.[2]" Id. at 850 (footnote in original).

Pursuant to Rehberg, the Court finds that even assuming arguendo that Defendants Rivera and Mead's alleged retaliatory investigation violated Plaintiff's First Amendment rights, Rivera and Mead still receive qualified immunity because Plaintiff's right to be free from a retaliatory investigation is not clearly established.  Rehberg, 611 F.3d at 850-51. See also Thompson, 426 F. App'x at 859 (same).  Accordingly, Defendants Rivera and Mead are entitled to qualified immunity as to Counts I and II, respectively.  Id.  Those Counts are dismissed with prejudice.  Helm v. Liem, 523 F. App'x 643, 646 (11th Cir.

---

[2]      The initiation of a criminal investigation in and of itself does not implicate a federal constitutional right.  The Constitution does not require evidence of wrongdoing or reasonable suspicion of wrongdoing by a suspect before the government can begin investigating that suspect. See United States v. Aibejeris, 28 F.3d 97, 99 (11th Cir. 1994). No § 1983 liability can attach merely because the government initiated a criminal investigation.

2013) (finding that the district court "properly dismissed [the plaintiff's] complaint with prejudice based on qualified immunity").

    **b.**    **Count III**

In Count III, Plaintiff alleges that Defendant Gretsas violated his civil rights by "illegally gathering information on Plaintiff in retaliation for" exercising his First Amendment rights, in violation of 42 U.S.C. § 1983. (Second Am. Compl. at 16.) Specifically, he alleges that "Defendant Gretsas retaliated against Plaintiff by ordering his subordinates to perform a retaliatory and clandestine investigation without a legitimate law enforcement purpose, keeping it off the books, but providing the results of this investigation which included false and/or misleading statements and/or arrangements of documents to him." (Id. ¶ 80.)

Gretsas argues that, for several reasons, Count III fails to state a First Amendment retaliation claim, (D.E. 35 at 5-11), and in any event, he is entitled to qualified immunity, (id. at 18-19). Because the Court finds that Gretsas is entitled to qualified immunity as to Count III, the Court will confine its analysis to that issue.

Gretsas argues that he is entitled to qualified immunity as to Count III because the Eleventh Circuit has specifically held that "'[t]he initiation of a criminal investigation in and of itself does not implicate a federal constitutional right.'" (Id. at 18 (quoting Rehberg, 611 F.3d at 850-51 & n.24, and citing Thompson, 426 F. App'x at 859; Joyner, 2018 WL 1442931, at *9).)

In his Response, Plaintiff argues that Gretsas is not entitled to qualified immunity as to Count III because in the Eleventh Circuit "it is 'settled law' 'since at least 1988' that

the government may not retaliate against citizens for the exercise of First Amendment rights." (Id. (quoting Bennett, 423 F.3d at 1256).)  He argues that "[t]he proper standard for this case is supplied by Bennett v. Hendrix, 423 F.3d 1247 (11th Cir. 2005) and Bailey v. Wheeler, 843 F.3d 473 (11th Cir. 2016), which make clear that a larger constitutional principle is at stake in First Amendment retaliation such as the instant case, and that government officials are on notice that they cannot retaliate against regular citizens for speaking out." (Id. at 19.)  Plaintiff further argues that the Court should not grant Gretsas qualified immunity because the affirmative defense is not unambiguously evident from the pleadings.  (Id. at 20.)

In his Reply, Gretsas maintains that a retaliatory investigation does not implicate a federal constitutional right; even if it did, the allege retaliatory and clandestine investigation would not deter a person of ordinary firmness from the exercise of their First Amendment rights; and the Second Amended Complaint fails to plausibly allege a causal link between his speech and Gretsas's allegedly retaliatory investigation.  (D.E. 42 at 3-6.)

Plaintiff does not contest that Gretsas was acting within his discretionary authority at all relevant times.  (D.E. 41 at 17.)  Thus, the burden shifts to Plaintiff to show that (1) Gretsas violated a constitutional right (2) that was clearly established at the time of the misconduct.  Rehberg, 611 F.3d at 838-39.

For the reasons discussed in Section III(a), supra, the Court finds that even assuming arguendo that Gretsas's alleged retaliatory investigation violated Plaintiff's First Amendment rights, Gretsas still receives qualified immunity because Plaintiff's right to be free from a retaliatory investigation is not clearly established.  Rehberg, 611 F.3d at 850-

51. <u>See also</u> <u>Thompson</u>, 426 F. App'x at 859 (same).  Accordingly, Defendant Gretsas is entitled to qualified immunity as to Count III.  <u>Id.</u>  That Count is dismissed with prejudice. <u>Helm</u>, 523 F. App'x at 646 (finding that the district court "properly dismissed [the plaintiff's] complaint with prejudice based on qualified immunity").

### c.    Count IV

In Count IV, Plaintiff alleges that Defendant Gretsas violated his civil rights by "creating and publishing false or misleading information concerning Plaintiff in retaliation for" exercising his First Amendment rights, in violation of 42 U.S.C. § 1983.  (Second Am. Compl. at 18.)  Specifically, he alleges that

> Defendant Gretsas retaliated against Plaintiff by preparing false and/or misleading information concerning Plaintiff in the Dossier, and by communicating the false and misleading materials to employees, elected officials, and residents to harm and defame Plaintiff.  Defendant Gretsas this time provided all or parts of the Dossier to the Miami Herald who published the false and misleading information provided by Defendant Gretsas publicly damaging Plaintiff's reputation.

(<u>Id.</u> ¶ 90.)

Gretsas argues that, for several reasons, Count IV fails to state a First Amendment retaliation claim, (D.E. 35 at 5-11), and in any event, he is entitled to qualified immunity, (<u>id.</u> at 18-19).  Because the Court finds that Gretsas is entitled to qualified immunity as to Count IV, the Court will confine its analysis to that issue.

Plaintiff does not contest that Gretsas was acting within his discretionary authority at all relevant times.  (D.E. 41 at 17.)  Thus, the burden shifts to Plaintiff to show that (1) Gretsas violated a constitutional right (2) that was clearly established at the time of the misconduct.  <u>Rehberg</u>, 611 F.3d at 838-39.

## 1.     Constitutional violation

Gretsas initially argues that Count IV is facially implausible because "the timeline

of events . . . does not add up."  (D.E. 35 at 10.)

> By way of example, Shiver claims that on May 15, 2019, Gretsas "created a
> 228-page PowerPoint presentation, entitled 'Miami Herald-Shiver Draft,'
> with negative information about Plaintiff"; then, adding confusion, Shiver
> states "the Miami Herald published highly negative articles on May 22, 2018,
> and on May 26, 2018, which included information and photographs from the
> 228-page PowerPoint presentation." Id. ¶¶ 38, 47. Shiver leaves the reader
> (and this Court) to guess the timeline of events and expects the reader (and
> this Court) to piece together conflicting allegations from the second amended
> complaint.

(Id.)  Gretsas further argues that "[b]ecause [Plaintiff] says Gretsas retaliated through his

own speech to the public, the second amended complaint must state a claim for defamation

under Florida law in order to succeed[,]" (id. at 10 (citing Echols v. Lawton, 913 F.3d 1313,

1320 (11th Cir. 2019))), and Count IV fails to state a claim for defamation under Florida

law because it pleads no facts that Gretsas published a false or defamatory statement, (id.

at 12-13).  Gretsas notes that the Second Amended Complaint includes allegations that

Plaintiff was a co-conspirator in a "non-existent money laundering scheme" and "that

cocaine was found in Plaintiff's possession, but argues that "Shiver does not allege any

specific facts demonstrating Gretsas uttered a false statement; nor does Shiver identify any

false statement that Gretsas published about him related to this chart."  (Id. (quoting Second

Am. Compl. ¶¶ 41-42, 44).)  Gretsas further argues that the Second Amended Complaint

fails to plausibly allege that the falsity of a statement caused Plaintiff injury: "Shiver offers

no information or facts about how his reputation was harmed.  His bald assertion that the

Miami Herald's publication caused him reputational harm is far too conclusory to support

25

a defamation claim." (Id. at 13.)  Gretsas further alleges that the Second Amended Complaint fails to plausibly allege "actual malice." (Id. at 14-15.)  Gretsas further argues that even assuming arguendo that the Second Amended Complaint plausibly alleges a defamation claim, Plaintiff failed to allege that Gretsas's allegedly defamatory statements would chill a person of ordinary firmness in the exercise of his First Amendment rights. (Id. at 15.)  Gretsas further argues that the Second Amended Complaint fails to allege a causal connection between the speech and the alleged adverse actions given the disjointed timeline of events alleged (i.e., the adverse actions allegedly occurred before the protected speech), the lack of factual allegations, and the lack of a close temporal connection between the protected speech and alleged adverse actions. (Id. at 16-18.)

In his Response, Plaintiff argues that Count IV is not intended to state a claim for defamation under Florida law, but instead alleges a First Amendment retaliation claim "in the form of publication, directly or through other means, of information concerning Plaintiff to third parties." (D.E. 41 at 10.)  He argues that this is a viable First Amendment claim because it would chill a person of ordinary firmness from exercising his First Amendment rights. (Id. (citing Bennett, 423 F.3d at 1252).)  He argues that Echols "does not establish a special rule for defamatory retaliation"; he argues that "[w]hat matters is not whether the actionable conduct has all the hallmarks of defamation, but whether it would have a chilling effect on a person of ordinary firmness." (Id. at 12.)  Plaintiff further argues that the Second Amended Complaint properly alleges publication by Defendant Gretsas. (Id. at 12-14.)  Plaintiff further argues that he is not required to plead that the retaliatory conduct actually chilled Plaintiff, only that it would have chilled a person of

ordinary firmness.  (Id. at 14.)  Plaintiff further argues that the Second Amended Complaint alleges a causal connection between his protected activities and the retaliatory conduct. (Id. (citing Second Am. Compl. ¶¶ 91-92, 94).)   He further argues that in any event, causation may be inferred from circumstantial evidence gleaned from the record as a whole.  (Id. at 14-15 (citing Freeman v. Perdue Farms Inc., 496 F. App'x 920, 926 (11th Cir. 2012); Bailey v. Com. Nat'l Ins. Servs., Inc., 267 F. App'x 167, 170 (3d Cir. 2008)).)

In his Reply, Gretsas argues that Plaintiff's assertion that Count IV is not intended to state a claim for defamation is fatal to the claim.  (D.E. 42 at 6-7.)  Specifically, he argues that Count IV is a reframed defamation claim; pursuant to Echols, a First Amendment retaliation claim based on defamation must allege that (1) the speech qualifies as defamation, and (2) whether the First Amendment protects that speech; and Plaintiff fails to meet the first element because he affirmatively argues that he is not asserting a defamation claim.  (Id.)  Gretsas further maintains that the Second Amended Complaint fails to give Gretsas fair notice of the substance of the defamatory statements, as he "fails to identify any specific offending and defamatory statements published by Gretsas."  (Id. at 7.)  He further maintains that the Second Amended Complaint fails to plausibly allege a chilling effect on the exercise of free speech.  (Id. at 7-8.)  Finally, Gretsas maintains that the Second Amended Complaint fails to plausibly allege a causal connection between the speech and the adverse actions.  (Id. at 8-9.)

The First Amendment "protects 'not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right.'"  Echols, 913 F.3d at 1320 (quoting Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir.

2000)).  "To state a claim for First Amendment retaliation, a plaintiff must allege that he engaged in protected speech, that the official's conduct adversely affected the protected speech, and that a causal connection exists between the speech and the official's retaliatory conduct."[3]  Id. (citing Bailey, 843 F.3d at 480-81).  Only the second and third elements are at issue.  Because the Court finds that the Second Amended Complaint fails to meet the "adverse affect" element, the Court confines its analysis to that issue.

"[A] defendant adversely affects protected speech if his alleged retaliatory conduct 'would likely deter a person of ordinary firmness from the exercise of First Amendment rights.'"  Bailey, 843 F.3d at 481 (quoting Bennett, 423 F.3d at 1254).  However, "special concerns" arise where, as here, the alleged retaliation consists of speech made by a public official—in this case, Gretsas's communications to employees, elected officials, residents, and the Miami Herald.  Id. (citing Dixon v. Burke Cnty., 303 F.3d 1271, 1275 (11th Cir. 2002) (citing Suarez Corp., 202 F.3d at 687))).  Thus, at least eight federal circuit courts of appeal require a plaintiff to show that a public official's allegedly retaliatory speech amounted to "a threat, coercion, or intimidation intimating that punishment, sanctions, or adverse regulatory action will imminently follow[.]'"  Echols, 913 F.3d at 1320 (citing Suarez Corp., 202 F.3d at 687 (collecting cases); Mirabella v. Villard, 853 F.3d 641, 651 (3d Cir. 2017); Mulligan v. Nichols, 835 F.3d 983, 990 (9th Cir. 2016); Goldstein v. Galvin, 719 F.3d 16, 30 (1st Cir. 2013); Hutchins v. Clarke, 661 F.3d 947, 956 (7th Cir. 2011); X-

---

[3]     The Court rejects Gretsas's argument that Plaintiff is required to state a claim for defamation under Florida law to succeed.  (See D.E. 35 at 10.)  A plaintiff may state a viable First Amendment retaliation claim that does not constitute a state law tort for defamation.  See Echols, 913 F.3d at 1320.

Men Sec., Inc. v. Pataki, 196 F.3d 56, 70 (2d Cir. 1999); Colson v. Grohman, 174 F.3d 498, 512 (5th Cir. 1999); Penthouse Int'l, Ltd. v. Meese, 939 F.2d 1011, 1015 (D.C. Cir. 1991)).  As the Eleventh Circuit recognized, these circuits "have required that an official's retaliatory speech amount to a threat, coercion, or intimidation to reconcile two competing rights: a plaintiff's right to be free from retaliation for exercising his First Amendment rights and an official's right to engage in protected speech."  Id. (citing Suarez Corp., 202 F.3d at 687 n.13).

The district court in Echols applied this standard in determining that the state attorney, Lawton, was not liable for First Amendment retaliation.  Id.  On appeal, the Eleventh Circuit did not resolve whether this standard applies in this circuit because it agreed with the plaintiff, Echols, that Lawton's conduct constituted defamation under Georgia law, and defamation falls "outside the protection of the First Amendment."  Id. (citing United States v. Alvarez, 567 U.S. 7409, 717 (2012)).  It found that "[t]he First Amendment affords no protection to Lawton's alleged libel of Echols, so no 'balance must be struck' here between the First Amendment rights of a plaintiff alleging retaliation for his speech and an official who allegedly retaliated through his own speech."  Id. at 1322 (quoting Suarez Corp., 202 F.3d at 687 n.13).  "We must instead determine only whether Lawton's alleged libel violated Echols's rights under the First Amendment."  Id.  The Eleventh Circuit then found that defamation is actionable as retaliation under the First Amendment, that the "ordinary firmness" test applies, and that "Lawton's alleged libel per se would have deterred a person of ordinary firmness from exercising his rights under the First Amendment."  Id. at 1323.

Here, Plaintiff explicitly argues that he is <u>not</u> attempting to state a claim for defamation.  (D.E. 41 at 10.)  Thus, the Court must decide whether Plaintiff must show that Gretsas's allegedly retaliatory speech amounted to "a threat, coercion, or intimidation intimating that punishment, sanctions, or adverse regulatory action will imminently follow[.]"  <u>Echols</u>, 913 F.3d at 1320.  Given the overwhelming authority holding that this standard applies when a plaintiff is suing a public official for speaking, the Court finds that this standard applies to Count IV.  <u>Suarez Corp.</u>, 202 F.3d at 687 ("[W]here a public official's alleged retaliation is in the nature of speech, in the absence of a threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will imminently follow, such speech does not adversely affect a citizen's First Amendment rights, even if defamatory."); <u>Mirabella</u>, 853 F.3d at 651 (same); <u>Mulligan</u>, 835 F.3d at 990 (same); <u>Goldstein</u>, 719 F.3d at 30 (same); <u>Hutchins</u>, 661 F.3d at 956 (same); <u>X-Men</u>, 196 F.3d at 70;[4] <u>Colson</u>, 174 F.3d at 512 (holding that city councilmembers making false accusations to the public about the plaintiff are not actionable under Section 1983); <u>Penthouse Int'l</u>, 939 F.2d at 1015 (finding that a letter from an advisory commission that allegedly attempted to chill constitutionally protected speech was not actionable because it contained "no threat to prosecute, nor intimation of intent to proscribe the distribution of

---

[4]        In <u>X-Men</u>, the Second Circuit noted that in certain contexts, speech by a public official need not rise to the level of threat, intimidation, or coercion to be actionable under Section 1983 where the speech is uttered by a "decisionmaker."  196 F.3d at 70 (citing <u>Vickery v. Jones</u>, 100 F.3d 1334, 1345 (7th Cir. 1996); <u>id.</u> at 71 (citing <u>United States v. Yonkers Bd. of Ed.</u>, 837 F.2d 1181, 1223-26 (2d Cir. 1987)).  However, neither <u>Vikery</u> nor <u>Yonkers</u> involved a First Amendment retaliation claim and are not otherwise relevant to this case.

the publications"); <u>Echols v. Lawton</u>, CASE NO. CV408-023, 2017 WL 3206629, at *7 (S.D. Ga. July 28, 2017).

The Court further finds that the Second Amended Complaint fails to allege that Gretsas's speech amounted to a threat, coercion, or intimidation intimating that punishment, sanctions, or adverse regulatory action will imminently follow.  (<u>See</u> Second Am. Compl. ¶¶ 38-54, 85-94.)  The most serious allegation contained in Count IV is that Gretsas "provided all or parts of the Dossier to the Miami Herald who published the false and misleading information provided by Defendant Gretsas publicly damaging Plaintiff's reputation." (Second Am. Compl. ¶ 90.)  That allegation simply does not meet the standard for stating a First Amendment retaliation claim against a public official.  <u>See</u> <u>Suarez Corp.</u>, 202 F.3d at 687; <u>Mirabella</u>, 853 F.3d at 651; <u>Mulligan</u>, 835 F.3d at 990; <u>Goldstein</u>, 719 F.3d at 30; <u>Hutchins</u>, 661 F.3d at 956; <u>X-Men</u>, 196 F.3d at 70; <u>Colson</u>, 174 F.3d at 512; <u>Penthouse Int'l</u>, 939 F.2d at 1015; <u>Echols</u>, 2017 WL 3206629, at *7 (S.D. Ga. July 28, 2017).  Therefore, the Court finds that Count IV fails to allege that Gretsas violated Plaintiff's First Amendment rights.

However, even if Plaintiff had adequately alleged that Gretsas violated Plaintiff's First Amendment rights, the Court finds that Gretsas is entitled to qualified immunity because the right was not clearly established.

### 2. Clearly established Constitutional right

Gretsas argues that he is entitled to qualified immunity as to Count IV because the right to be free from a government official's First Amendment retaliation was not a clearly established right prior to the Eleventh Circuit's January 25, 2019 decision in <u>Echols</u>; and

with respect to any alleged conduct by Gretsas that occurred post-<u>Echols</u>, the <u>Echols</u> decision is not sufficiently analogous to provide a "fair and clear warning that Gretsas's conduct may constitute a violation of the First Amendment."  (<u>Id.</u> at 19-21.)

In his Response, Plaintiff argues that Gretsas is not entitled to qualified immunity as to Count IV.  (D.E. 41 at 17-19.)  As with Count III, he argues that the proper standard is the one discussed in <u>Bennett</u> and <u>Bailey</u>, which recognize a broader, clearly established principle that government officials cannot retaliate against citizens for exercising their First Amendment rights.  (D.E. 41 at 19.)  He argues that <u>Echols</u>

> does not establish a different standard for the circumstances of the instant case. The <u>Echols</u> court stressed that it had to look at the specific context of the case, and that given the facts of that case, the prosecutor was not on notice that his allegedly defamatory testimony to the Georgia legislature constituted a violation the First Amendment.

(<u>Id.</u>)  Plaintiff further argues that the Court should not grant Gretsas qualified immunity because the affirmative defense is not unambiguously evident from the pleadings.  (<u>Id.</u> at 20.)

In his Reply, Gretsas maintains that he is entitled to qualified immunity because his conduct did not violate a clearly established constitutional right.  (D.E. 42 at 9-10 (citing <u>Rehberg</u>, 611 F.3d at 851; <u>Echols</u>, 913 F.3d at 1324-26).)

The Court finds that even assuming <u>arguendo</u> that Plaintiff has stated a First Amendment retaliation claim against Gretsas, that right was not clearly established at the time of the alleged conduct.  <u>Echols</u>, 913 F.3d at 1324-25.

In <u>Echols</u>, the plaintiff-appellant ("Echols") was convicted of kidnapping and rape and sentenced to fifteen years' imprisonment.  913 F.3d at 1318.  After serving seven years

of his sentence, DNA tests revealed that semen recovered from the victim did not match

Echols's DNA.  Id.  Thus, the trial court vacated Echols's sentence and granted him a new

trial; however, the same state attorney who prosecuted the case seven years prior

("Lawton") instead entered a nolle prosequi and dismissed the indictment against Echols.

Id.  Four years later, the Georgia Claims Advisory Board recommended compensating

Echols, and a Georgia state legislator introduced a bill to compensate him with $1.6 million

for his wrongful convictions.  Id.  However, before the legislators voted on the bill, Lawton

sent a letter and memorandum to several legislators opposing the compensation.  Id.

> Lawton told the legislators that Echols's convictions "were proper and
> fitting, even though [his] conviction[s] had been vacated." Lawton also told
> the legislators not to presume Echols innocent of kidnapping and rape
> because the vacatur of his convictions did not establish his innocence.
> Lawton urged the legislators not to compensate Echols unless he proved his
> innocence. And Lawton told the legislators that Echols remained under
> indictment for kidnapping and rape even though the indictment had been
> dismissed four years earlier when the state entered a nolle prosequi on the
> charges.

Id.  Echols later filed a complaint against Lawton alleging, inter alia, First Amendment

retaliation.  Id.  The district court found that Echols failed to state a claim for First

Amendment retaliation, and that Lawton enjoyed qualified immunity because Echols's

complaint failed to allege the violation of a right that was clearly established when Lawton

sent his letter.  Id.

On appeal, the Eleventh Circuit initially disagreed with the district court, finding

that Echols stated a claim for defamation under Georgia law, and that the First Amendment

did not protect Lawton's defamatory speech.  Id. at 1320-23.  The Eleventh Circuit noted

that "[a]fter a plaintiff engages in protected speech, an official may retaliate with physical

or economic harm, but he may also retaliate with injurious speech." Id. at 1322.  It stated that when deciding whether defamation in a particular case is retaliatory, courts should "apply the same test of ordinary firmness as they would for any other claim of retaliation." Id. at 1322-23.  It then found that Lawton's speech would have deterred a person of ordinary firmness from exercising his rights under the First Amendment. Id. at 1323.  Thus, the Eleventh Circuit held that Echols had stated a First Amendment retaliation claim.  Id.

However, the Eleventh Circuit further found that Lawton did not violate a First Amendment right that was clearly established.  Id. at 1323-25.  It found that there was no controlling precedent clearly establishing Lawton's conduct as a constitutional violation, and that Lawton's conduct did not so obviously violate the Constitution that prior case law was unnecessary.  Id. at 1324-25.  Additionally—and directly relevant to Plaintiff's argument here—it rejected Echols's argument that the broader, clearly established principle that retaliating against a citizen for exercising his constitutional rights applied to defamation claims.  Id.  The court explained:

> "[S]ome broad statements of principle in case law [that] are not tied to particularized facts . . . can clearly establish law applicable in the future to different sets of detailed facts."  Vinyard v. Wilson, 311 F.3d 1340, 1351 (11th Cir. 2002).  But the principle must establish with "obvious clarity" that "in the light of pre-existing law the unlawfulness [of the official's conduct is] apparent."  Id. at 1353.  True, "it is 'settled law' that the government may not retaliate against citizens for the exercise of First Amendment rights." Bennett, 423 F.3d at 1256.  But that general principle does not resolve with "obvious clarity" that defamation may constitute retaliation in violation of the First Amendment.  See also Reichle v. Howards, 566 U.S. 658, 665, 132 S. Ct. 2088, 182 L. Ed. 2d 985 (2012) (rejecting the argument that "the general right to be free from retaliation for one's speech" clearly establishes a violation of the First Amendment).

Id. at 1324-25.  Consequently, the Eleventh Circuit held that Lawton lacked fair notice that his defamatory statements violated the Constitution, and therefore he enjoyed qualified immunity from Echols's First Amendment retaliation claim.

Here, too, Plaintiff relies on the broad principle that government officials cannot retaliate against citizens for exercising their First Amendment rights.  (D.E. 41 at 19 (citing Bennett, 423 F.3d at 1256; Bailey, 843 F.3d at 483-85).)  Pursuant to Echols, this broad principle does not apply to claims of (or resembling) defamation.  913 F.3d at 1324-25 (holding that the "general principle does not resolve with 'obvious clarity' that defamation may constitute retaliation in violation of the First Amendment").  Therefore, the Court finds that prior to Echols, the alleged retaliatory conduct alleged in Count IV was not a violation of clearly established law.  As such, Gretsas enjoys qualified immunity as to any alleged retaliatory speech that pre-dates the January 25, 2019 Echols decision.

However, Gretsas appears to concede that Echols itself clearly established—for the first time in the Eleventh Circuit—that under certain circumstances, a government official violates the Constitution when (1) he engages in retaliatory speech against a citizen, and (2) such speech would likely deter a person of ordinary firmness from engaging in protected speech.  (D.E. 35 at 20.)  The question becomes whether the Echols decision was sufficient to provide Gretsas fair notice that the retaliatory conduct alleged in Count IV violated the Constitution, such that he does not enjoy qualified immunity for any alleged

retaliatory conduct that occurred after January 25, 2019—the date on which the Eleventh Circuit decided <u>Echols</u>.[5]

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 741 (2011) (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)).  A case directly on point is not required, "but existing precedent must have placed the statutory or constitutional question beyond debate."  <u>Id.</u>  "'[C]learly established law' should not be defined 'at a high level of generality.'"  <u>White v. Pauly</u>, __ U.S. __, 137 S. Ct. 548, 552 (2017) (quoting <u>al-Kidd</u>, 563 U.S. at 731).  Rather, "the clearly established law must be 'particularized' to the facts of the case."  <u>Id.</u> (quoting <u>Anderson</u>, 483 U.S. at 640).  The Court looks "only to binding precedent at the time of the challenged conduct—that is, 'the decisions of the Supreme Court, the Eleventh Circuit, or the highest

---

[5]        As previously discussed, Plaintiff

can "demonstrate that the contours of the right were clearly established in one of three ways." <u>Loftus v. Clark-Moore</u>, 690 F.3d 1200, 1204 (11th Cir. 2012) (alteration adopted) (citation and internal quotation marks omitted). First, he can point us to a "materially similar case [that] has already been decided." <u>Id.</u> (citation and quotation marks omitted). Second, he can point us to "a broader, clearly established principle that should control the novel facts of the situation." <u>Id.</u> (alterations adopted). Third, "the conduct involved in the case may so obviously violate the [C]onstitution that prior case law is unnecessary." <u>Id.</u> at 1205 (alterations adopted).

<u>Echols</u>, 913 F.3d at 1324.  In <u>Echols</u>, the Eleventh Circuit held that conduct of the type alleged in Count IV is not a violation of clearly established law under the second or third methods.  <u>Id.</u> at 1324-25.  Accordingly, Plaintiff can only establish that Gretsas's conduct was a violation of clearly established law under the first method.

court of the state.'" Echols, 913 F.3d at 1324 (quoting Bailey, 843 F.3d at 483).  However,

"a clearly established violation of state law cannot put an official on notice that his conduct

would also violate the Constitution because 'section 1983 protects only against violations

of federally protected rights.'" Id. (quoting Casines v. Murchek, 766 F.2d 1494, 1501 n.10

(11th Cir. 1985)).

Gretsas argues that "the allegations in the instant case do not resemble the

allegations made in Echols" such that "'every reasonable official would have understood'

at the time of the challenged conduct that Gretsas's actions violated the First

Amendment[.]"  (D.E. 35 at 19-20 (quoting al-Kidd, 563 U.S. at 741).)

Apparently conceding that there is no binding precedent clearly establishing that

Gretsas's conduct violated the Constitution—indeed, Plaintiff distinguishes Echols, (D.E.

41 at 11-12)—Plaintiff argues that the broader, clearly established principle that

government officials cannot retaliate against citizens for exercising their First Amendment

rights controls.  (D.E. 41 at 19.)  However, as previously discussed, the Eleventh Circuit in

Echols rejected that argument as it applies to claims of (or resembling) defamation.  913

F.3d at 1324-25.

The Court finds that the allegations in Echols are not sufficiently analogous to the

allegations in this case such that they provided Gretsas with fair notice that his conduct

violated the Constitution.  Indeed, but for the fact that both cases involved claims for First

Amendment retaliation, the allegations are not similar at all.  In Echols, the Eleventh

Circuit focused on the allegation that Lawton falsely told Georgia legislators—with actual

malice—that Echols remained under indictment for kidnapping and rape when, in fact, the

indictment had been dismissed.  913 F.3d at 1321-23.  Such conduct constituted actionable libel per se under Georgia law.  Id. (citations omitted).  The Eleventh Circuit observed: "If a district attorney defamed a former prisoner for seeking legislative compensation for his wrongful convictions and derailed that legislative effort, a person of ordinary firmness would likely be deterred from speaking again on that matter lest the prosecutor continue to tarnish his reputation or, worse, initiate a wrongful prosecution. So Echols's complaint states a claim of retaliation under the First Amendment." Id. at 1323.

Without question, the conduct alleged in Echols bears no resemblance to the conduct alleged in Count IV.  Rather, Count IV alleges that

> Plaintiff exercised his First Amendment rights to speech, press, and petition by speaking out critically online and to individuals who would listen about harassment and retaliatory [sic] following and [sic] investigations by HPD, due to his speaking about on [sic] waste, fraud, and/or abuse earlier, and Defendant Gretsas [sic] involvement therein. ¶¶26-28. Before and after running for office, Plaintiff spoke out about police harassment he endured.

(Id. ¶ 89.)

> Defendant Gretsas retaliated against Plaintiff by preparing false and/or misleading information concerning Plaintiff in the Dossier, and by communicating the false and misleading materials to employees, elected officials, and residents to harm and defame Plaintiff. Defendant Gretsas this time provided all or parts of the Dossier to the Miami Herald who published the false and misleading information provided by Defendant Gretsas publicly damaging Plaintiff's reputation. ¶¶38-45.

(Id. ¶ 90.)

Thus, whereas Echols involved retaliatory defamation by a prosecutor against a former prisoner seeking redress for spending seven years in prison for offenses that were subsequently dismissed, Count IV alleges retaliatory defamation by a City Manager against

a political adversary who spoke out on issues of public concern.  The Court finds that Echols is not sufficiently analogous to give Gretsas fair notice that his conduct clearly violated the Constitution.  As such, he is entitled to qualified immunity as to Count IV.[6] That Count is dismissed with prejudice.  Helm, 523 F. App'x at 646 (finding that the district court "properly dismissed [the plaintiff's] complaint with prejudice based on qualified immunity").

### d.    Count V

In Count V, Plaintiff alleges that the City of Homestead violated his civil rights by conducting a retaliatory investigation in response to Plaintiff's exercise of his First Amendment rights, in violation of 42 U.S.C. § 1983.  (D.E. 32 ¶¶ 95-111.)  Specifically, it alleges that the City had a

> custom and practice consist[ing] of investigating Plaintiff, using official resources through improper channels and procedures, and repeatedly communicating the improperly gathered information with a false narrative to harm Plaintiff's person, reputation, and career, and even going so far as to contact Plaintiff's employer leading to his forced resignation, all in retaliation for Plaintiff's continued exercise of his [F]irst Amendment rights to speech, press, and petition.

(Id. ¶ 108.)

The City argues that Plaintiff has not and cannot state a claim for municipal liability under Monell because (1) there is no underlying constitutional violation, (D.E. 36 at 11-

---

[6]    The Court does not condone Gretsas's alleged conduct.  See Echols, 913 F.3d at 1325 (condemning Lawton's alleged conduct).  Rather, the Court's ruling on this issue reflects only that "qualified immunity protects a badly behaving official unless he had fair notice that his conduct would violate the Constitution[.]"  Id. (citing District of Columbia v. Wesby, __ U.S. __, 138 S. Ct. 577, 589-91 (2018); Kisela v. Hughes __ U.S. __, 138 S. Ct. 1148, 1152 (2017)).

12), and (2) he has failed to allege an unofficial custom or practice of constitutional violations under the "final policymaker" theory, (id. at 12-16).

Plaintiff argues that the Second Amended Complaint adequately alleges a Monell claim because it alleges that "the City, acting through its manager and/or police chief, had a custom or policy that constituted and evinced deliberate indifference to Plaintiff's constitutional rights, and said policy caused damages to Plaintiff[.]" (D.E. 40 at 15 (citing Second Am. Compl. ¶¶ 6-7, 97, 99, 107-10).) He further argues that "[t]he policy consisted of investigating Plaintiff through use of governmental resources without probable cause, and to use and communicate to the public the improperly gathered information to harm Plaintiff and to intimidate him and retaliate against Plaintiff for speaking his mind[.]" (Id. (citing Second Am. Compl. ¶¶ 29-54, 108).) He further argues that the Second Amended Complaint properly alleges municipal liability under a "final policymaker" theory because it alleges that Gretsas was the City's final policymaker and that Gretsas engaged in and ordered the constitutional violations. (Id. at 18-19.)

In Reply, the City argues that Count V fails to state a Monell claim because there is no underlying Constitutional violation. (D.E. 43 at 8-10.)

It is well settled that a municipality cannot be held liable under Section 1983 for its employees' torts under the theory of respondeat superior. Monell, 436 U.S. at 691. "Instead, to impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or

custom caused the violation."[7] <u>McDowell v. Brown</u>, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing <u>City of Canton v. Harris</u>, 489 U.S. 378, 388 (1989)).  Because the Court finds that the Second Amended Complaint fails to allege a constitutional violation, the Court confines its analysis to that issue.

The City argues that Count V must be dismissed because it fails to allege an underlying constitutional violation.  (D.E. 36 at 11-12.)  In this regard, it argues that Count V is premised on an alleged retaliatory investigation, but the Eleventh Circuit has held that the initiation of an investigation is not a constitutional violation.  (<u>Id.</u> at 12 (citing <u>Rehberg</u>, 611 F.3d at 850).)

In his Response, Plaintiff argues that the Second Amended Complaint alleges that the City

> had a custom or policy that constituted and evinced deliberate indifference to Plaintiff's constitutional rights, and said policy caused damages to Plaintiff (¶¶6, 97, 99, 107-110; 7). The policy consisted of investigating Plaintiff through use of governmental resources without probable cause, and to use and communicate to the public the improperly gathered information to harm Plaintiff and to intimidate[8] him and retaliate against Plaintiff for speaking his mind (¶¶29-54, 108).

---

[7]      A plaintiff may establish a municipal custom or practice in at least the following ways: (1) identifying an officially promulgated municipal policy, <u>Hoefling v. City of Miami</u>, 811 F.3d 1271, 1279 (11th Cir. 2016) (citing <u>Monell</u>, 436 U.S. at 661, 694-95; <u>McKusick v. City of Melbourne</u>, 96 F.3d 478, 483 (11th Cir. 1996)); (2) showing that the municipality's "final policymakers[7] have acquiesced in a longstanding practice that constitutes the entity's standard operating procedure," <u>id.</u> (citing <u>Bd. of Cty. Comm'rs v. Brown</u>, 520 U.S. 394, 403-04 (1997)); <u>Brown v. City of Ft. Lauderdale</u>, 923 F.2d 1474, 1481 n.11 (11th Cir. 1991)); (3) showing that a final policymaker has adopted or ratified the unconstitutional decision of a subordinate public official, <u>id.</u> (citing <u>Matthews v. Columbia Cty.</u>, 294 F.3d 1294, 1297 (11th Cir. 2002)); and (4) in "limited circumstances," a failure to adequately train or supervise employees, <u>Gold v. City of Miami</u>, 151 F.3d 1346, 1350 (11th Cir. 1998) (quoting <u>City of Canton</u>, 489 U.S. at 387).

[8]      The Second Amended Complaint does <u>not</u> allege that Gretsas engaged in First Amendment retaliation to intimidate Plaintiff.

(D.E. 40 at 15.)  Thus, Plaintiff argues that the Second Amended Complaint alleges two Constitutional violations: (1) retaliatory investigation and (2) Gretsas's retaliatory speech.

In its Reply, the City argues that "there is no question that the City is free to use governmental resources to conduct investigations, whether or not probable cause exists, which the Eleventh Circuit has explicitly recognized."  (Id. (citing Rehberg, 611 F.3d at 850 n.24 (citing United States v. Aibejeris, 28 F.3d 97, 99 (11th Cir. 1994)).)  It further argues that Plaintiff's claim that "[c]ommunication of information within the City and to third-parties—or rather, the decision to communicate such information—simply does not rise to the level of a municipal custom or policy."  (Id. at 9.)  It argues that

> [t]he mere exercise of discretion by an employee about who he or she speaks to or the content of that speech does not give rise to a constitutional violation under Monell—and Plaintiff offers no authority that reflecting that such a claim can rise to the level of a final policymaker action. Logic dictates that he cannot, as the result would be indistinguishable from respondeat superior liability.

(Id. (citing City of St. Louis v. Praprotnik, 485 U.S. 112, 126 (1988); Quinn v. Monroe Cnty., 330 F.3d 1320, 1326 (11th Cir. 2003); S. Atl. Cos., LLC v. Sch. Bd. of Orange Cnty., Fla., 699 F. App'x 842, 846 (11th Cir. 2017)).)

First, the Court finds that to the extent Count V is premised on a retaliatory investigation, it fails to state a claim for municipal liability under Section 1983.  Rehberg, 611 F.3d at 850 n.24.

> The initiation of a criminal investigation in and of itself does not implicate a federal constitutional right.  The Constitution does not require evidence of wrongdoing or reasonable suspicion of wrongdoing by a suspect before the government can begin investigating that suspect.  See United States v.

> Aibejeris, 28 F.3d 97, 99 (11th Cir. 1994).  No § 1983 liability can attach
> merely because the government initiated a criminal investigation.

Id.  Moreover, a government official's "retaliatory animus does not create a distinct constitutional tort."  Id. at 850.

Second, the Court finds that to the extent Count V is premised on Gretsas's retaliatory speech, it fails for the reasons explained in Section III(c)(1), supra.  Specifically, the Second Amended Complaint fails to allege that Gretsas's speech amounted to a threat, coercion, or intimidation intimating that punishment, sanctions, or adverse regulatory action will imminently follow.  See Suarez Corp., 202 F.3d at 687; Mirabella, 853 F.3d at 651; Mulligan, 835 F.3d at 990; Goldstein, 719 F.3d at 30; Hutchins, 661 F.3d at 956; X-Men, 196 F.3d at 70;[9] Colson, 174 F.3d at 512; Penthouse Int'l, 939 F.2d at 1015; Echols, 2017 WL 3206629, at *7 (S.D. Ga. July 28, 2017).

Because the Second Amended Complaint fails to allege a Constitutional violation, Count V fails to state a claim for municipal liability under Monell.  See Aracena v. Gruler, 347 F. Supp. 3d 1107, 1120 (M.D. Fla. 2018) (finding that because the amended complaint failed to allege an underlying constitutional violation, the plaintiff failed to state a claim for municipal liability under Monell).

---

[9]    As discussed in Note 4, supra, in X-Men, the Second Circuit noted that in certain unrelated contexts, speech by a public official need not rise to the level of threat, intimidation, or coercion to be actionable under Section 1983 where the speech is uttered by a "decisionmaker." 196 F.3d at 70 (citing Vickery, 100 F.3d at 1345; id. at 71 (citing Yonkers Bd. of Ed., 837 F.2d at 1223-26 (2d Cir. 1987)).  However, the Second Circuit cases are inapplicable, and in any event, in the Eleventh Circuit, municipal liability can only arise from a custom or policy attributable to the city's final "policymaker."   See Quinn, 330 F.3d at 1325-26.  A decision by a city's "decisionmaker" can only give rise to individual liability.  Id. at 1326-27.

## IV.     Conclusion

The Court's July 26, 2021 Order dismissing the First Amended Complaint explicitly stated that it was providing "Plaintiff leave to make a <u>final</u> amendment to cure all deficiencies, if [he is] able to so." (D.E. 31 (emphasis in original).)  Because Plaintiff failed to cure all the deficiencies, and because the individual Defendants are entitled to qualified immunity, the Second Amended Complaint shall be dismissed with prejudice.  <u>See</u> <u>Fernau v. Beauty Prods., Inc.</u>, 847 F. App'x 612, 615, 623 (11th Cir. 2021) (affirming dismissal with prejudice of second amended complaint after district court warned the plaintiffs that if they were unable to adequately plead their claims in a second amended complaint, the court would be inclined to grant a motion to dismiss with prejudice).

Accordingly, it is **ORDERED AND ADJUDGED** that:

1.     Defendant George Gretsas's Motion to Dismiss Second Amended Complaint (D.E. 35) is **GRANTED**;

2.     The Homestead Defendants' Motion to Dismiss Second Amended Complaint with Prejudice (D.E. 36) is **GRANTED**;

3.     The Second Amended Complaint is **DISMISSED WITH PREJUDICE**;

4.     All pending motions are **DENIED AS MOOT**; and

44

5.      This case is now **CLOSED**.

**DONE AND ORDERED** in Chambers at Miami, Florida this 4th day of October,

2021.

**JOAN A. LENARD**
**UNITED STATES DISTRICT JUDGE**